IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH - CENTRAL DIVISION

FILED
DISTRICT COURT
2006 SEP 20  P 1: 40

| | |
|---|---|
| STATE OF UTAH; UTAH SCHOOL AND INSTITUTIONAL TRUST LANDS ADMINISTRATION; and UTAH ASSOCIATION OF COUNTIES, | **ORDER AND OPINION** |
| Plaintiffs, | Case No. 2:96-CV-0870 |
| vs. | Judge Dee Benson |
| GALE NORTON, in her official capacity as SECRETARY OF INTERIOR, et al., | |
| Defendants, | |
| and | |
| SOUTHERN UTAH WILDERNESS ALLIANCE, et al., | |
| Defendant-Intervenors. | |

## I. INTRODUCTION

The present matter comes before the Court on Defendant-Intervenors'[1] cross claims

challenging a settlement agreement between the state Plaintiffs, the State of Utah; the Utah

School and Institutional Trust Lands Administration; and the Utah Association of Counties

(collectively Utah), and the federal Defendants, Gale Norton, Secretary of the Interior; Kathleen

Clarke, Director of the Bureau of Land Management; and the Bureau of Land Management

(collectively the BLM).  The settlement agreement (the Settlement) resolves a dispute between

Utah and the BLM over the creation and maintenance of wilderness study areas on public lands

---

[1] The Defendant-Intervenors consist of the following: Southern Utah Wilderness Alliance, Wilderness Society, New Mexico Wilderness Alliance, Arizona Wilderness Alliance, Friends of Nevada Wilderness, Colorado Environmental Coalition, Natural Resources Defense Council, Biodiversity Conservation Alliance, California Wilderness Coalition, and the Idaho Conservation League.  The Defendant-Intervenors will be referred to in this opinion as "SUWA."

in Utah.  SUWA asks the Court to vacate the Settlement and issue an injunction barring its

implementation.  SUWA's claims were argued before the Court on July 28, 2006.  The Court has

considered the legal briefs and oral arguments of the respective parties and enters the following

Opinion and Order.

## II. BACKGROUND

### A.  Wilderness Review and Controversy

In 1964, Congress passed the Wilderness Act, establishing a National Wilderness

Preservation System.  See 16 U.S.C. § 1131.  Within the National Wilderness Preservation

System, Congress planned to set aside "wilderness areas," to "secure for the American people of

present and future generations the benefits of an enduring resource of wilderness."  Id. § 1131(a).

Wilderness areas, Congress explained, are areas "where the earth and its community of life are

untrammeled by man" and "where man himself is a visitor who does not remain."  Id. § 1131(c).

Certain activities, including commercial enterprises and permanent roads and structures, are

prohibited in an area once it becomes wilderness.  See id. § 1133(c).  Congress declared that

these areas are to be administered "in such manner as will leave them unimpaired for future use

as wilderness."  Id.

The Wilderness Act directed the Secretaries of Agriculture and the Interior to review

specific federal lands and determine within ten years which lands qualified for wilderness

designations by Congress.  The wilderness review provisions of the Wilderness Act specifically

mandated a review of only national parks, wildlife refuges, and a small portion of the national

forests.  See id. § 1132(b),(c).  BLM lands were not mentioned.  But in 1976, with the passage of

the Federal Land Policy and Management Act (FLPMA), Congress made its wilderness review

mandate also applicable to BLM lands.  At the time of the passage of FLPMA, the Department of

2

the Interior (DOI), through the BLM, managed about 448 million acres of federally owned lands and their resources under thousands of different and often conflicting public land laws. With the enactment of FLPMA, Congress intended to provide a comprehensive statement of the BLM's purposes, goals, and authority over public lands.

Section 107 of FLPMA grants the BLM broad discretion to manage public lands. The act declares that the BLM should manage lands "on the basis of multiple use and sustained yield unless otherwise specified by law." 43 U.S.C. § 1701(a)(7). Regarding wilderness, section 603 of FLMPA established a fifteen-year period during which the BLM was to review and identify BLM lands eligible for designation as wilderness by Congress. Lands so identified became known as wilderness study areas (WSAs). Because WSAs may become actual wilderness areas if Congress designates them as such, FLPMA mandates that these lands be managed "so as to not impair the suitability of such areas for preservation as wilderness." Consequently, the BLM developed an Interim Management Policy (IMP) to provide guidance for managing WSAs under FLPMA's stringent non-impairment standard.

Following the BLM's FLPMA-mandated wilderness review, the BLM was required to recommend to the President areas for wilderness designation. And within two years after receiving the BLM's report, the president was to advise Congress of his recommendations.

In 1980, the BLM completed its wilderness inventory of public lands in Utah. After its review of millions of acres of BLM land, the BLM determined that 14.5 million acres "clearly and obviously" lacked wilderness characteristics and dropped those lands from further wilderness review. See State of Utah v. Babbitt, 137 F.3d 1193, 1198 (10th Cir. 1998). Ultimately, based upon an intense review of the remaining public lands, and after a public comment period, the BLM published its final inventory decision designating approximately 2.5 million acres as

3

WSAs. Environmental groups challenged the BLM's decision through the BLM's administrative appeals process. By the end of this process, the BLM had increased its WSA recommendation to 3.2 million acres.

In October 1991, Secretary of the Interior Manual Lujan, Jr., announced his recommendation to President George H.W. Bush regarding the designation of public lands as part of the wilderness preservation system. Secretary Lujan recommended that approximately 1.9 million acres of the 3.2 million acres of WSAs in Utah be designated as wilderness. Two years later, in 1993, President Bush made an identical recommendation to Congress. To date, with the exception of a few areas, Congress has not acted on the President's recommendations. The entire 3.2 million acres of public lands designated as WSAs in Utah continue to be managed under FLPMA's stringent non-impairment standard.

In 1993, during the Clinton Administration, SUWA urged the DOI to reconsider the Utah wilderness recommendations made by President Bush and lobbied the DOI to support H.R. 1500, a bill that proposed approximately 5.7 million acres of wilderness in Utah, which included the 3.2 million acres designated as WSAs by the BLM, plus 2.7 million additional acres already of federal and state land. Members of Utah's Congressional delegation, however, supported a competing bill, recommending only 2.1 million acres of wilderness. Nonetheless, before Congress acted on either proposal, the BLM ordered that all of the public lands included in H.R. 1500 be managed as if they were WSAs.

In 1996, Secretary of the Interior Bruce Babbitt decided that the BLM would conduct a re-inventory of certain BLM lands in Utah. Secretary Babbitt directed the BLM to reexamine the 5.7 million acres included in H.R. 1500 for the presence of wilderness characteristics. Unlike the initial inventory, however, the re-inventory reviewed not only federal land but also adjacent state

4

land.   The re-inventory evaluated 3.1 million acres of federal land and 529,260 acres of Utah

trust lands for their wilderness character.   These "wilderness re-inventory areas" (WIAs) were

lands that the BLM had previously determined, in many cases after two or more evaluations, did

not qualify as WSAs because they lacked wilderness character as defined in the Wilderness Act.

About half of the WIAs were originally found to lack wilderness character in 1980 and were

never the subject of protest or appeal.

### B. Utah Litigation and Prior Proceedings

Utah initiated the present lawsuit on October 14,1996, when it filed a complaint

challenging Secretary Babbitt's authority to conduct the 1996 re-inventory and the procedures by

which the re-inventory was to proceed.   Utah sought to enjoin the BLM from completing the re-

inventory.   Utah also challenged the BLM's interim management or "*de facto*" wilderness

management of approximately 3.6 million acres of WIAs, which, as explained above, were not

WSAs established by the original FLPMA section 603 wilderness review but instead were

included in pending wilderness proposals before Congress.   Although these WIAs were not

designated as WSAs, the BLM managed them under the strict non-impairment standard.   On

November 18, 1996, the Court entered a preliminary injunction and enjoined Secretary Babbitt's

re-inventory.   The BLM appealed to the Tenth Circuit Court of Appeals.

On March 2, 1998, the Tenth Circuit vacated the preliminary injunction.   The court

determined that Utah lacked standing because it had failed to identify a concrete, actual, or

imminent injury-in-fact fairly traceable to the 1996 inventory and which was likely to be

redressed by a favorable decision.   The court concluded that section 201 of FLPMA, which

authorizes the BLM to conduct resource inventories, did not require public involvement.

Consequently, Utah did not have standing to challenge the re-inventory.   The Tenth Circuit

remanded the case to this Court with instructions to dismiss all but one of Utah's claims. Utah's lone remaining claim, which was the only claim not directly related to the re-inventory, was its allegation that the BLM was unlawfully managing various public lands in Utah as *de facto* wilderness. Utah filed a second amended complaint and pursued its remaining claim.

After the remand, the BLM resumed its re-inventory of public lands in Utah. This re-inventory culminated in a 1999 report describing the inventoried land's wilderness characteristics. Although the BLM had previously concluded that many of these WIA lands were ineligible for wilderness designation, in its re-inventory report the BLM concluded that an additional 2.6 million acres of federal land and 442, 910 acres of Utah state school trust lands had wilderness character.

Following the publication of the Utah wilderness re-inventory report, the DOI Solicitor directed the BLM to protect wilderness resources in the WIAs. Furthermore, the BLM did not approve mineral leases for lands that were within WIAs, even though the land use plans classified the land as available for oil and gas leasing. The BLM also delayed related development actions.

In January 2001, in the closing days of the Clinton Administration, and without any public notice or comment, the BLM adopted a new Wilderness Inventory and Study Procedures Handbook (2001 WIH). This new handbook contained specific guidance on conducting new wilderness inventories and designating new WSAs as part of the BLM's land use planning process. The 2001 WIH stated that WSAs could be established under either section 202 or section 603 of FLPMA—section 202 requires the BLM to develop land use plans for each area of BLM land. In addition, the new policy applied the non-impairment standard to WSAs established under section 202 as well as section 603. In Utah, the BLM's state director issued a

6

written directive confirming that BLM officials were not to act on any project that might impair the WIAs' wilderness character. And the Utah BLM field offices added the establishment of WSAs under section 202 of FLPMA as an issue to be addressed during the Utah resource management plan (RMP) revisions.

In March, 2003, after lengthy discovery and failed attempts at a settlement, Utah filed a third amended complaint. Utah alleged that the BLM's authority under FLPMA section 603, and by extension section 202, to establish WSAs and to manage such areas under the non-impairment standard, expired in 1993 when the President forwarded his wilderness recommendations to Congress. The BLM, Utah alleged, exceeded its statutory authority by establishing new WSAs after the expiration of section 603's deadline. As a result, the BLM had managed land as WSAs under the non-impairment standard where the multiple-use and sustained-yield standard should have governed. Utah also alleged that as a result of its wilderness review policies, the BLM had improperly withheld public lands from mineral leasing.

On April 9, 2003, in response to Utah's third amended complaint, SUWA moved to intervene. Two days later, on April 11, 2003, Utah and the BLM filed a stipulation and joint motion to enter an order approving a settlement and to dismiss Utah's third amended complaint. In the Settlement, the BLM agreed with Utah that the BLM's authority under section 603 of FLPMA to conduct wilderness reviews terminated no later than 1993. Specifically, the Settlement included the following:

- The BLM's authority to conduct wilderness reviews expired no later than October 21, 1993, with the submission of President George H.W. Bush's wilderness recommendations to Congress pursuant to section 603 of FLPMA.

- Since the expiration of its authority under section 603, the BLM has not had the authority to create any new WSAs or to manage additional lands under section 603's non-impairment standard.

- The BLM would not "establish, manage or otherwise treat public lands, other than section 603 WSAs and [c]ongressionally designated wilderness, as WSAs or as wilderness pursuant to the [s]ection 202 process absent congressional authorization."

- The BLM would expunge any mention of additional, non-section 603 WSA designations from certain management plans in process.

- The BLM agreed that the 1999 wilderness reinventory would not be used to create additional WSAs or to manage public lands as if they are or may become WSAs.

- The BLM agreed to withdraw the 2001 WIH and related guidance, under which non-WSA lands identified during the re-inventory and elsewhere were being temporarily protected.

- The BLM would refrain from applying the IMP to BLM lands other than existing WSAs.

- The BLM, however, continued to have the authority under FLPMA to: (a) manage a tract of land that has been dedicated to a specific use according to any other provision of law, (b) utilize the criteria in section 202(c) to develop and revise land use plans, including giving priority to the designation and protection of areas of critical environmental concern, and (c) take any action necessary, by regulation or otherwise, to prevent unnecessary or undue degradation of public lands.

- And nothing in the agreement was "intended to diminish [the BLM's] authority under FLPMA to prepare and maintain on a continuing basis an inventory of all public lands and their resources and other values, as described in FLPMA [s]ection 201. These resources and other values may include, but are not limited to characteristics that are associated with the concept of wilderness."

On April 14, 2003, at the request of Utah and the BLM, the Court approved the Settlement, entered an order making the provisions of the Settlement an order of the Court, and dismissed Utah's complaint with prejudice. In addition, the Court retained jurisdiction for purposes of enforcing the Settlement.

Also at this time, the National Resources Defense Council moved to intervene as a defendant, and SUWA sought leave to file objections to the Settlement. On May 2, 2003,

SUWA filed amended answers and cross claims against the BLM for entering into the Settlement with Utah. And on June 3, 2003, SUWA filed a motion to vacate the Settlement.

On June 12, 2003, the Court entered an order allowing SUWA to intervene as a matter of right. The next day, SUWA appealed this Court's order approving the Settlement and dismissing Utah's claims to the Tenth Circuit.

On February 8, 2005, the Tenth Circuit dismissed SUWA's appeal. The Court of Appeals determined that there was no final or appealable judgment because SUWA's cross claims against the BLM remained pending in this Court. The Tenth Circuit, therefore, remanded the matter.

On remand, SUWA moved to vacate the consent decree. On August 8, 2005, the Court granted SUWA's Motion to Vacate the Consent Decree Pending Conclusion of District Court Proceedings. Following this ruling, Utah and the BLM revised the Settlement. The revised agreement is the same as the original agreement, except that it eliminates those elements that made the original agreement a consent decree, i.e., the parties do not seek the Court's approval of any specific provisions of the Settlement, ask the Court to enter the Settlement or stipulations as an order of the Court, or ask the Court to retain jurisdiction over the agreement's enforcement. On September 9, 2005, based upon the revised agreement, Utah and the BLM filed a joint motion to dismiss Utah's third amended and supplemental complaint.

On October 4, 2005, the Court granted the joint motion, and dismissed Utah's claims without prejudice. The Court also granted SUWA leave to amend their cross claims. On December 8, 2005, SUWA filed its amended answer and revised cross claims. The Court held a hearing on SUWA's cross claims on July 28, 2006. After hearing argument from Utah, the BLM, and SUWA, the Court took the matter under advisement.

9

## C. Statutory Background

### 1.    Wilderness Act

With the passage of the Wilderness Act in 1964, Congress intended to preserve the

undeveloped character of designated wilderness areas.  See Utah Ass'n of Counties v. Bush, 316

F. Supp. 2d 1172, 1180 (D. Utah 2004).   In the Act, Congress explained that "wilderness" is

> an area of undeveloped Federal land retaining its primeval
> character and influence, without permanent improvements or
> human habitation, which is protected and managed so as to
> preserve its natural condition and which (1) generally appears to
> have been affected primarily by the forces of nature, with the
> imprint of man's work substantially unnoticeable; (2) has
> outstanding opportunities for solitude or a primitive and
> unconfined type of recreation; (3) has at least five thousand acres
> of land or is of sufficient size as to make practicable its
> preservation and use in an unimpaired condition; and (4) may also
> contain ecological, geological, or other features of scientific,
> educational, scenic, or historical value.

16 U.S.C. § 1131(c).  These wilderness areas are to be included in the National Wilderness

Preservation System (NWPS), which was also created by the Act.  See id. § 1131(a).  Once an

area receives "wilderness" status, commercial enterprises, roads, motorized equipment, mining,

and oil and gas leasing, are prohibited in that area.  See 16 U.S.C. § 1133(c); Utah Ass'n of

Counties, 316 F. Supp. 2d at 1180.

The Wilderness Act designated 9.1 million acres for immediate inclusion in the NWPS.

Primitive areas that were excluded from immediate wilderness designation were included in a

review process for potential future designation.  See Amy Rashkin et al., The Wilderness Act of

1964: A Practioner's Guide, 21 J. Land Resources & Envtl. L. 219, 227 (2001).  The Act,

therefore, directed the Secretaries of Agriculture and the Interior to review specific federal lands

and determine which lands qualified for wilderness designation by Congress—knowing that

agency-created wilderness areas were neither fixed nor consistent, "Congress created a means by

which a system of wilderness could be created that would provide the appropriate safeguards and that designated Congress alone as the final arbiter of which federal lands would actually achieve status as wilderness areas." See Utah Ass'n of Counties, 316 F. Supp. 2d at 1180.  Specifically, the Act ordered the Secretary of the DOI, within ten years, to review "every roadless area of five thousand contiguous acres or more in the national parks, monuments and other units of the national park system and every such area of, and every roadless island within, the national wildlife refuges and games ranges, under his jurisdiction." 16 U.S.C. § 1132(c).  Lands under the BLM's management, however, were not mentioned in the original inventory provisions of the Wilderness Act.

2.     **FLPMA**

In 1976, twelve years after the passage of the Wilderness Act, Congress passed FLPMA, which provided the BLM "with an organic act to guide its management priorities and practices" and contained a wilderness inventory mandate for BLM lands. See Sarah Krakoff, Settling the Wilderness, 75 U. Colo. L. Rev. 1159, 1163 (2004).  The following provisions of FLPMA guide the BLM in its management of public lands.

a.     **Section 107**

Section 107 of FLPMA contains a congressional declaration of policy for the management of public lands.  It also establishes a BLM regime of inventory and planning. Congress explains that the "national interest will be best realized if the public lands and their resources are periodically and systematically inventoried and their present and future use is projected through a land use planning process coordinated with other Federal and State planning efforts." 43 U.S.C. § 1701(a)(2).  Unless otherwise specified by law, the planning and management of these inventoried lands must be "on the basis of multiple use and sustained

11

yield." Id. § 1701(a)(7).  The term "multiple use" is defined by FLPMA as "the management of public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people." Id. § 1702(c).  The Supreme Court in Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55 (2004), explained that multiple use management "is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put." Id. at 58.  "Sustained yield" is defined by FLPMA as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." Id. § 1702(h).  In other words, sustained yield requires the BLM "to control depleting uses over time, so as to ensure a high level of valuable uses in the future." Norton, 542 U.S. at 58.

Section 107 further mandates that the public lands

> be managed in a manner that will protect the quality of scientific,
> scenic, historical, ecological, environmental, air and atmospheric,
> water resource, and archeological values; that where appropriate,
> will preserve and protect certain public lands in their natural
> condition; that will provide food and habitat for fish and wildlife
> and domestic animals; and that will provide for outdoor recreation
> and human occupancy and use.

Id. § 1701(a)(8).  Although section 107 calls for the prompt development of regulations and plans for the protection of areas of critical environmental concern on public lands, see id. § 1701(a)(11), it also recognizes that the public lands should be managed "in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands," id. § 1701(a)(12).

### b.      Section 201

Recognizing that in order to properly manage the public lands the BLM needs to understand the resources under its control, Congress requires the BLM to "prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including but not limited to outdoor recreation and scenic values), giving priority to areas of critical environmental concern." 43 U.S.C. § 1711(a). Moreover, the BLM must keep this inventory current "so as to reflect changes in conditions and to identify new and emerging resource and other values." Id. Although the BLM is supposed to use the results of the inventories conducted under this section in its land use planning, "[t]he preparation and maintenance of such inventor[ies] or the identification of such areas shall not, of itself, change or prevent change of the management or use of public lands." Id.

### c.      Section 202

Section 202 requires that the BLM develop and maintain land use plans for each BLM area. See 43 U.S.C. § 1712(a). The criteria set out in section 202 for developing land use plans require the BLM to strike a balance between competing demands on public lands. For example, section 202 states that in the development and revision of land use plans, the BLM shall

> (1) use and observe the principles of multiple use and sustained yield; (2) use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences; (3) give priority to the designation and protection of areas of critical environmental concern; (4) rely to the extent it is available, on the inventory of the public lands, their resources, and other values; (5) consider present and potential uses of the public lands; (6) consider the relative scarcity of the values involved and the availability of alternative means (including recycling) and sites for realization of those values; (7) weigh long term benefits to the public against short-term benefits; . . .[and] (8) provide for compliance with the applicable pollution control laws . . . .

13

Id. § 1712(c)(1).  Finally, section 202, provides that the BLM shall allow an opportunity for public involvement in the formulation of plans and programs relating to the management of public lands.  Id. § 1712(f).

>    **d.     Section 603**

Section 603 provides an exception to the BLM's mandate to manage public lands under the principles of multiple use and sustained yield.  This section gave the BLM a time-limited power to select federal lands under its control meeting the definition of wilderness for designation as WSAs.  Section 603 provides that "[w]ithin fifteen years after October 21, 1976, the [Interior] Secretary shall review those roadless areas of five thousand acres or more and roadless islands of the public lands, identified during the inventory required by section [201] . . . as having wilderness characteristics described in the Wilderness Act," and "shall from time to time report to the President his recommendations as to the suitability or nonsuitability of each such area or island for preservation as wilderness."  43 U.S.C. § 1782(a).  The President, in turn, had two years after receiving each report from the BLM to recommend to Congress areas for designation as wilderness.  See id. § 1782(b).  After the President made his recommendations, it was left to Congress to decide which lands, if any, to designate as wilderness through legislation.

While WSAs are awaiting wilderness designation by Congress, the BLM "shall continue to manage such lands . . . in a manner so as not to impair the suitability of such areas for preservation as wilderness, subject however, to the continuation of existing mining and grazing uses and mineral leasing in the manner and degree in which the same was being conducted on October 21, 1976," the date of FLPMA's enactment.  Id. § 1782(c).  The existing mining, mineral, and grazing uses, however, shall be managed so as to "prevent unnecessary or undue degradation of the lands and their resources or to afford environmental protection."  Id.  This

14

more lenient standard for lands with existing mining and grazing uses requires that the least degrading land-use alternatives be implemented.

### 3.        Interim Management Policy

Shortly after the passage of FLPMA, the BLM adopted an IMP for lands under wilderness review.  The IMP interpreted section 603's non-impairment mandate and set out in detail how the agency would manage WSAs.  The IMP interprets section 603(c) to require the BLM to manage each WSA to prevent it from being "degraded so far, compared with the area's values for other purposes, as to significantly constrain the Congress's prerogative to either designate [it] as wilderness or release it for other uses."  Addendum to SUWA's Opening Brief and Motions at 359.  The IMP also indicates that "[m]anagement to the non-impairment standard does not mean that the lands will be managed as though they had already been designated as wilderness."  Id.  The non-impairment standard permits only those activities which are temporary, create no new surface disturbance, or involve no permanent structures.  The IMP restricts, among other things, motor vehicle use within existing WSAs to existing "ways" and designated "open" areas.  Id. at 367.

### 4.        NEPA

Enacted by Congress in 1970, the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370 et seq., establishes a "national policy [to] encourage productive and enjoyable harmony between man and his environment."  Dep't of Transp. v. Public Citizen, 541 U.S. 752, 756 (2004) (quotations and citation omitted) (alteration in original).  NEPA is "intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States."  Id. (citation omitted).  NEPA does not impose any substantive limits on agency conduct.  See Silverton Snowmobile Club v.

15

United States Forest Service, 433 F.3d 772, 780 (10th Cir. 2006).  "Rather, NEPA imposes only

procedural requirements on federal agencies with a particular focus on requiring agencies to

undertake analyses of the environmental impact of their proposals and actions."  Public Citizen,

541 U.S. at 756-57.  NEPA "prescribes the necessary process by which federal agencies must

take a 'hard look' at the environmental consequences of the proposed courses of action."

Silverton Snowmobile Club, 433 F.3d at 780 (quotations and citation omitted).  "Once

environmental concerns are adequately identified and evaluated by the agency, NEPA places no

further constraint on agency actions."  Id.

NEPA requires that before an agency may take "major federal actions significantly

affecting the quality of the human environment," the agency must prepare an environmental

impact statement (EIS), in which the agency considers the environmental impacts of the

proposed action and evaluates alternatives to the proposed action, including the option of taking

no action.  Id.; 42 U.S.C. § 4332(2)(C).  When an agency does prepare an EIS, the agency is

required to "rigorously explore and objectively evaluate all reasonable alternatives, and for

alternatives which were eliminated from detailed study, briefly discuss the reasons for their

having been eliminated."  40 C.F.R. § 1502.14.  Agencies need not prepare a full EIS, however,

if they initially prepare "the less detailed environmental assessment (EA) and, based on the EA,

issue a finding of no significant impact (FONSI), concluding that the proposed action will not

significantly affect the environment.  Silverton Snowmobile Club, 433 F.3d at 780.  Regulations

promulgated under NEPA further require that  "[u]ntil an agency issues a record of decision . . .

no action concerning the proposal shall be taken which would: (1) [h]ave an adverse

environmental impact; or (2) [l]imit the choice of reasonable alternatives."  40 C.F.R. §

1506.1(a)

### III. DISCUSSION

As an initial matter, Utah and the BLM argue that the Court does not have jurisdiction to address SUWA's objections to the Settlement because it is not a judicially reviewable final agency action. SUWA, therefore, lacks standing to challenge the BLM's decision to enter into the Settlement with Utah. Furthermore, SUWA's facial challenge to the agreement seeks unredressable advisory relief, and SUWA's cross claims are not ripe for judicial review.

SUWA challenges the Settlement between Utah and the BLM on several grounds. First, SUWA argues that the Settlement enshrines an interpretation of FLPMA sections 201, 202, and 603 that is contrary to FLPMA's plain language. SUWA also contends that the Settlement conflicts with NEPA and an injunction issued by a California district court in Sierra Club v. Watt, 608 F. Supp. 305 (E.D. Cal. 1985).

The Court will first determine whether SUWA has standing to pursue its challenges to the Settlement and whether this matter is ripe for judicial review. Then, the Court will address SUWA's challenges to the legality of the Settlement.

### A.    Standing and Other Justiciability Issues

The BLM and Utah argue that this suit is not justiciable, both because SUWA lacks standing and because the issues SUWA raises are not yet ripe for review.

The doctrinal foundation of standing is constitutional: Article III of the Constitution limits the jurisdiction of federal courts to actual cases or controversies. Allen v. Wright, 468 U.S. 737, 750 (1984). In order to meet the constitutional requirements for standing, SUWA must show that it has suffered an injury in fact that is both concrete and imminent, that the injury is fairly traceable to the actors and the actions of which SUWA complains, and that that injury is likely to be redressed by a favorable decision from the Court. Lujan v. Defenders of Wildlife,

17

504 U.S. 555, 560–561 (1992).[2]  Since neither FLPMA nor NEPA creates a private right of

action, plaintiffs must bring this suit under the judicial review provisions of the Administrative

Procedure Act (APA), 5 U.S.C. § 702, and satisfy the standing requirements of the APA as well.

Utah v. Babbitt, 137 F.3d 1193, 1203 (10th Cir. 1998).  To meet the standing requirements of the

APA, SUWA must show that it is complaining of final agency action and that its "claims fall

within the zone of interests protected by the statute forming the basis of [its] claims." Id.

(quotations and citations omitted).  Plaintiffs bear the burden of alleging facts establishing they

have standing.  Babbitt, 137 F.3d at 1202.

To satisfy the first element of the standing inquiry, a plaintiff must have suffered an

injury in fact, "an invasion of a legally protected interest that is concrete and particularized and

actual or imminent." Colorado Environmental Coalition v. Wenker, 353 F.3d 1221, 1234 (10th

Cir. 2004) (quotations and citation omitted).  SUWA attempts to shoulder this burden by

submitting the declarations of a number of its members who "use areas that have been impacted

by the Settlement." SUWA Rep. Br. at 10.  These declarations reveal that SUWA's members use

and enjoy "wilderness-quality" BLM lands in Wyoming, California, Idaho, Colorado, New

Mexico, Arizona, Nevada, and Utah, and that those lands "are now ineligible for WSA protection

after the Settlement." Id. at n. 7.  But before SUWA can complain that the Settlement results in

diminished protection for wilderness quality lands, it must demonstrate that the affected land

---

[2]  The quantum and type of evidence that must be adduced in order to carry the burden to
establish standing varies with the stage in the proceedings at which the question of standing
arises: "each element must be supported in the same way as any other matter on which the
plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the
successive stages of the litigation." Lujan, 504 U.S. at 561.  When the complaining party is not
the object of the government action of which he complains, standing becomes "substantially
more difficult to establish." Id. at 561–562.  The nature and extent of SUWA's burden need not
be further addressed here, since the Court concludes that the facts SUWA has presented in
support of standing would be incapable of satisfying the least demanding standard.

18

is—in some legally meaningful sense—of wilderness quality. All the declarations SUWA cites in support of its assertion of injury in fact contain the declarants'—rather than the BLM's—wilderness assessment of particular parcels of land.

SUWA cites, for example, the declaration of Erik Molvar, the Wilderness Inventory Coordinator for the Biodiversity Conservation Alliance, whose position entails "conducting and supervising field investigations of Bureau of Land Management lands in Wyoming to determine whether they have wilderness character as defined by the Wilderness Act of 1964." Molvar Dec. ¶ 5, Exh. 1 to Dkt. No. 189. Ryan Henson, the Policy Director of the California Wilderness Coalition, indicates in his declaration that his organization inventoried land in California and identified a good many acres of "wilderness-caliber BLM land." Henson Dec. ¶ 6, Exh. 2 to Dkt. No. 189. The Policy Director of the Idaho Conservation League similarly declared that his position "involves conducting field investigations of Bureau of Land Management lands in Idaho to determine whether they have wilderness character as defined by the Wilderness Act of 1964." McCarthy Dec. ¶ 5, Exh. 3 to Dkt. No. 189. The Regional Director of the Wilderness Society's Four Corner States regional office, too, has enjoyed areas "identified by conservationists as wilderness-quality lands pursuant to the protocol established in the Wilderness Inventory Handbook." Eaton Dec. ¶ 14, Ex. 2 to Dkt. No. 290. The Executive Director of the New Mexico Wilderness Alliance has guided his agency through a six-year inventory process of BLM lands and presented some of the results to the BLM. Scarantino Dec. ¶ 7, Exh. 3 to Dkt. No. 290. The Grand Canyon Regional Coordinator of the Arizona Wilderness Coalition includes in her job duties "conducting field investigations of Bureau of Land Management lands . . . to determine whether they have wilderness character as defined by the Wilderness Act of 1964." Crumbo Dec. ¶ 5, Exh. 4 to Dkt. No. 290. Members of Friends of Nevada Wilderness have "conducted

19

wilderness inventories on BLM-managed lands . . . using the methods outlined in the BLM's Wilderness Inventory Handbook." Netherton Dec. ¶ 8, Exh. 5 to Dkt. No. 290.  The Colorado Environmental Coalition (CEC) helped to compile the Citizens' Wilderness Proposal, which is based on "inventories conducted by citizens, including many CEC members, since the 1960s." Widen Dec. ¶ 4, Exh. 6 to Dkt. No. 290.

SUWA cites its members' praise of the "wilderness-quality" lands they visit as though individual (or corporate) perception of wilderness attributes in a particular parcel of land were enough to trigger an obligation to protect (or at least formally consider protecting) that land as wilderness.  But wishful thinking is not a basis for designation as a WSA under any conceivable interpretation of FLPMA, which provides that "[t]he Secretary shall prepare and maintain on a continuing basis an inventory of all public land."  43 U.S.C. § 1711(a) (emphasis added).  The process by which wilderness-quality lands are identified is thus set by statute and does not include nomination by SUWA's membership.  And while FLPMA mandates public participation in the land-use planning process, the earlier course of this very lawsuit establishes that members of the public "have no right under [FLPMA] § 201 to participate in the inventory process." Babbitt, 137 F.3d at 1213.

SUWA does provide evidence regarding two areas in Colorado which the BLM contemplated managing more restrictively, but regarding which BLM policy has since shifted. SUWA cites two declarations by the Wilderness Society's Four Corner States Office Regional Director, Suzanne Jones, indicating that in the summer of 1999 the BLM conducted a re-inventory of South Shale Ridge and Bangs Canyon in Colorado and as a result concluded that a number of acres in each area "contained wilderness character."  Jones Dec. 1, ¶ 8, Second Supp. Add. at 210; Jones Dec. 2, ¶ 8, Second Supp. Add. at 213.  In June 2001 the BLM submitted a

notice of intent to revise the land management plans for the two areas to take into account the results of the re-inventory, but the planned amendments never took place and the Grand Junction Field Office instead began a process that could permit oil and gas leasing in South Shale Ridge and the construction of new routes for motorized vehicles in the Bangs Canyon area.  Jones Dec. 1, ¶¶ 9–11, Second Supp. Add. at 210; Jones Dec. 2, ¶¶ 9–11, Second Supp. Add. at 213.

SUWA's suit is founded on the changes in policy that accompany changes in administration.  SUWA does not argue that the BLM cannot change its opinion of whether particular parcels of land possess wilderness characteristics.  Indeed, § 201 expressly permits the Secretary to prepare and maintain an inventory of public lands on a continuing basis and to ensure that the inventory is kept current "to reflect changes in conditions and to identify new and emerging resource and other values."  43 U.S.C. § 1711(a).  It is only when the Secretary begins the process of changing land-use plans that rights to public participation attach.  Since, by SUWA's own admission, the BLM did not undertake a § 202 process to change the land-use plan for either Bangs Canyon or South Shale Ridge, SUWA has not been deprived of any cognizable right—to participate or otherwise—by these decisions.  See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 485 (1982) ("[T]he psychological consequence presumably produced by observation of conduct with which one disagrees. . . . is not an injury sufficient to confer standing under Art. III.").

SUWA maintains that their environmental and aesthetic injuries are sufficient to establish standing since environmental plaintiffs "adequately allege injury in fact when they aver that they use [an] affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 183 (2000) (quotations and citations omitted).  While Lujan and Friends of

the Earth recognize that harm to environmental or aesthetic interests can constitute injury in fact

for standing analysis, nothing in either decision suggests that any environmental injury

is—without more—sufficient to create standing.  The more that is required is injury to a "legally

protected interest."  Lujan, 504 U.S. at 560.  It is not enough that the environment is being

damaged if a plaintiff can point to no legally protected interest in keeping a particular piece of

land in its pristine state.  SUWA's interpretation would convert the recognition that

environmental injuries count for purposes of standing analysis into a license to complain in court

of any land-use decision with which any person disagrees.  Neither statute nor case law works to

constitute individuals or organizations as environmental knights errant, capable of intervening to

rescue the imperiled earth at any and every stage of administrative decision-making.  SUWA has

alleged no harm to any legally protected interest, so has failed to establish that it has suffered an

injury in fact.

At the bottom of all the evidence of injuries SUWA offers is a disagreement between

SUWA and the BLM over whether certain parcels of land have wilderness characteristics.  This

fact opens a considerable gulf between the injuries SUWA alleges and the purported legal error

to which they attribute their injuries.  The actual injuries of which SUWA provides evidence

have nothing to do with whether the BLM has the authority to create WSAs under § 202 of

FLPMA, but with whether the BLM is required to perceive wilderness characteristics wherever

SUWA does.

SUWA maintains that its members "have suffered specific environmental and aesthetic

injuries from the implementation of the Settlement through various development projects."  Id. at

10.  But the evidence SUWA cites does not establish that any injuries its members have suffered

are the result of the implementation of the Settlement.  As discussed above, much of SUWA's

22

evidence relates to areas that SUWA's members believe have wilderness qualities but which were never designated as § 202 WSAs. See, e.g., Bloxham Dec. ¶¶ 9–10, Second Supp. Add. at 202 (complaining of oil and gas leases in the Upper Desolation Canyon wilderness inventory area and the Flat Tops proposed wilderness unit); Thomas Dec. ¶ 8–9, Second Supp. Add. at 218 (describing use and enjoyment of three wilderness inventory areas in Utah); Eaton Dec. ¶ 14, Exh. 2 to Dkt. No. 290 (describing personal use and enjoyment of areas in Colorado, New Mexico and Arizona "identified by conservationists as wilderness-quality lands"); Widen Dec. ¶ 6, Ex. 6 to Dkt. No. 290 (describing visits to "many proposed wilderness areas" in Colorado); First Jones Dec. ¶¶ 8–14, Sec. Supp. Add. at 210 (describing plans to "continue to advocate for [the] designation of [South Shale Ridge and other lands in Colorado] as wilderness"); Second Jones Dec. ¶¶ 8–11, Second Supp. Add. at 212–213 (complaining that the implementation of a new management plan in Bangs Canyon, Colorado will "diminish [the] potential [of the area] for inclusion in the National Wilderness Preservation System"). These injuries are not traceable to the Settlement, but to the differences between the BLM's perception of wilderness characteristics and SUWA's wishes and beliefs.

Moreover, the harm SUWA alleges is that the BLM's current interpretation of FLPMA is unlawful in that it does not recognize the validity of WSAs created pursuant to § 202. But SUWA conceded at oral argument that none of the lands regarding which they now complain were ever designated as WSAs, under § 202 or otherwise. The individual land-use planning decisions of which SUWA complains are not only not fairly traceable to the Settlement but are utterly unrelated to it.

SUWA insists, however, that its members' injuries are the result of the implementation of the Settlement. But the evidence SUWA marshals in favor of this argument suggests the reverse,

23

that the Settlement is but a single instance of a general change in policy. The environmental

assessment for South Shale Ridge that SUWA includes in its second supplemental addendum, for

example, explains that the Settlement was applied in a manner consistent with BLM policy:

> It is no longer BLM policy to continue to make formal determinations regarding
> wilderness character, to designate new WSAs through the land use planning
> process, or to manage any lands—except WSAs established under Section 603 of
> the FLPMA and other existing WSAs—in accordance with the non-impairment
> standard prescribed in the Interim Management Policy. Consistent with BLM
> policies for the identification, management and protection of multiple uses, terms
> of the settlement were applied Bureau-wide.

South Shale Ridge Oil and Gas Leasing Proposal, Environmental Assessment, SUWA Second

Supplemental Addendum at 15. The support SUWA offers to demonstrate that the Settlement

caused a change in policy indicates that a change in policy was prior to the Settlement, and that

the Settlement implements the policy, rather than the other way around.

Since SUWA's alleged injuries are not the result of the BLM's decision to enter into the

Settlement, a decision from this Court invalidating the Settlement would leave these injuries

unaffected. If the Court were to find the BLM has the power under § 202 to create WSAs, the

BLM would not exercise that power to designate as WSAs lands in which it has hitherto

recognized insufficient wilderness characteristics to offer the land the heightened protection it

may accord under § 202.

But SUWA insists that the Court can redress its injuries because "those adversely

affected by a discretionary agency decision generally have standing to complain that the agency

based its decision upon an improper legal ground." SUWA Rep. Br. at 14 (quoting Federal

Election Com'n v. Atkins, 524 U.S. 11, 25 (1998)). SUWA's reliance on the general rule

articulated in Atkins is misplaced. Even if the BLM's interpretation of FLPMA is improper, the

harms SUWA has alleged remain unconnected to it, and a decision identifying the impropriety would not redress the harms.

The hurdles set up by the constitutional requirements for standing are not the only obstacles SUWA is incapable of surmounting. Parties attempting to establish standing under the APA must demonstrate that they are complaining of final agency action and that their claim falls within the zone of interests protected by the statute on which they base their claims. An agency action is final if its impact is direct and immediate; if it represents the consummation of an agency's decision-making process rather than a tentative or interlocutory step; and if it determines rights and obligations or if legal consequences flow from it. Colorado Farm Bureau Federation v. Forest Service, 220 F.3d 1171, 1173–74 (10th Cir. 2000). The BLM and Utah argue that the Settlement is not final agency action because it does not determine SUWA's rights or obligations and has no direct and immediate consequences for SUWA in the absence of a concrete land-use planning decision affecting a § 202 WSA. SUWA responds by arguing that the Settlement is final agency action because it determines the BLM's rights and obligations. As SUWA points out, an agency action can be final even in the absence of an immediate and direct effect on the party complaining if the action "alter[s] the legal regime to which the . . . agency is subject." Bennett v. Spear, 520 U.S. 154, 178 (1997). SUWA contends that the Settlement is final agency action because it binds the agency to a particular interpretation of FLPMA eliminating the BLM's wilderness inventory power under § 201 and dictating a lesser degree of protection for existing § 202 WSAs. SUWA concedes that the Settlement has had no effect on any existing WSA, so its claim that the Settlement constitutes final agency action rests instead on the options the Settlement forecloses. But the Settlement does not, as SUWA would have it, strip the BLM of its powers to protect lands it determines to have wilderness characteristics in a

25

manner substantially similar to the manner in which such lands are protected when designated as WSAs. In other words, the Settlement does not affect the BLM's rights or obligations to manage land with wilderness characteristics in a manner that will leave those characteristics unimpaired. That SUWA can point to not a single instance of alteration in the manner in which § 202 WSAs have been managed suggests that the Settlement does not in practice bind the BLM to any particular course of management of land with wilderness characteristics, and certainly does not require the immediate dismantling of existing § 202 WSAs.

The cases on which SUWA relies for a definition of final agency action as action that binds the agency differ from this case because the agency decisions in those cases bound the affected agencies so that certain actions were foreclosed. See Rocky Mountain Oil & Gas Assoc. v. Watt, 696 F.2d 734, 741 (10th Cir. 1982) (agency interpretation of law governed decision whether to permit drilling in WSAs); Croplife America v. E.P.A., 329 F.3d 876, 881–82 (D.C. Cir. 2003) (agency determination disallowed consideration of studies formerly permitted); Role Models America, Inc. v. White, 317 F.3d 327, 332 (D.C. Cir. 2003) (government action final because obligated government to convey property to particular conveyee); Gneral Motors Corp. v. E.P.A., 363 F.3d 442, 448 (D.C. Cir. 2004) (if an agency bases enforcement decisions on a document and leads private or state actors to believe that agency decisions depend on compliance with the document, the document is a binding decision). The Settlement has no such binding effect on the BLM, which remains free to inventory land for wilderness characteristics pursuant to § 201 and to protect land so as to leave wilderness character unimpaired under § 202. SUWA's assessment of the likelihood that the BLM will do so is based on political, rather than legal grounds, and should be addressed by political, rather than legal, means.

26

Standing is not the only doctrine that works to prevent the adjudication of matters unsuitable for resolution by the courts. The doctrines of standing and ripeness both focus "on whether the harm asserted has matured sufficiently to warrant judicial intervention," <u>Initiative and Referendum Institute v. Walker</u>, 450 F.3d 1082, (10th Cir. 2006) (en banc) (quotations and citations omitted), but standing doctrine focuses narrowly on the harm a plaintiff has asserted, while the ripeness inquiry examines more broadly the institutional harms associated with delaying or proceeding with adjudication. Premature adjudication could frustrate the process Congress has developed for administrative decision-making, depriving an affected agency of the opportunity to revise and refine its policies through a public comment process, objections, and administrative appeals. <u>See</u> <u>Ohio Forestry Assoc. v. Sierra Club</u>, 523 U.S. 726, 735 (1998). Premature adjudication presents perils for courts as well as for administrative agencies; precipitate judicial intervention requires consideration of the likelihood and likely effect of myriad contingent and hypothetical decisions an agency could reach. Awaiting an agency's final decision before adjudicating it thus respects the institutional competence of agencies in making and implementing policy and of courts in adjudicating concrete disputes; the ripeness doctrine protects courts from "entanglement . . . in abstract disagreements over administrative policies" and protects administrative agencies from "judicial interference" before agency plans have been finalized and their effects felt. <u>Abbott Laboratories v. Gardner</u>, 387 U.S. 136, 148 (1967).

The ripeness inquiry centers on "whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." <u>New Mexicans for Bill Richardson</u>, 64 F.3d 1495, 1499 (10th Cir. 1995) (quotations and citations omitted). In order to winnow out cases involving such uncertainty, the Court must consider

> 1) whether the issues in the case are purely legal; 2) whether the agency action is 'final agency action' within the meaning of the Administrative Procedure Act, 5

U.S.C. § 704; 3) whether the action has or will have a direct and immediate impact upon the plaintiff; and 4) whether the resolution of the issues will promote effective enforcement and administration by the agency.

Mobil Exploration & Producing U.S., Inc v. Department of the Interior, 180 F.3d 1192, 1197 (10th Cir. 1999).[3]  No single factor in this test is dispositive.  See, e.g., Park Lake Resources Limited Liability Company v. United States Department of Agriculture, 197 F.3d 448, 451–52 (10th Cir. 1999) (issue not ripe for review despite the fact that the challenged agency action defined as final by regulation); Mobil Exploration, 180 F.3d at 1197 (issue not ripe for review although both parties agreed the issues were purely legal ones).   The details of the various tests for ripeness differ, but all the tests aim at determining whether the issues in a case are fit for judicial resolution and what hardships the parties would suffer from withholding adjudication. See Ohio Forestry, 523 U.S. at 733.  Plaintiffs carry the burden of demonstrating that their claims are ripe for review.  Park Lake, 197 F.3d at 450.

The second element of the test, whether the challenged action is final agency action, the Court has already resolved against SUWA.  The third element, whether the agency's action has some direct effect on the plaintiff, weighs heavily in favor of finding the issues unripe.  As

---

[3] The Tenth Circuit Court of Appeals has also employed a different version of this test, which asks

> 1) whether delayed review would cause hardship to the plaintiffs; 2) whether judicial intervention would inappropriately interfere with further administrative action; and 3) whether the courts would benefit from further factual development of the issues presented.

Sierra Club v. United States Department of Energy, 287 F.3d 1256, 1262 (10th Cir. 2002). These tests are interchangeable.  See Coalition for Sustainable Resources, Inc. v. United States Forest Service, 259 F.3d 1244, 1250 n.11 (10th Cir. 2001) (finding the two tests "essentially include. . . all the same considerations).

discussed above in connection with standing, SUWA has pointed only to future, speculative injuries in connection with § 202 WSAs rather than to immediate, actual ones. There are, indeed, a variety of steps—with accompanying opportunities for public participation—that must take place before SUWA's members face any immediate and direct effect of the Settlement. When there is "a considerable legal distance" between the action complained of and the moment its effects can be felt by the complaining party, review delayed until the alleged harm is closer at hand is unlikely to occasion harm. See Ohio Forestry, 523 U.S. at 734 ("[B]efore the Forest Service can permit logging, it must focus upon a particular site, propose a specific harvesting method, prepare an environmental review, permit the public an opportunity to be heard, and (if challenged) justify the proposal in court. . . . The Sierra Club thus will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain."). The final element also favors delaying adjudication, thus giving the BLM the benefit of experience in refining its land management policies through the public comment process and through site-specific planning.

But SUWA insists that the issues it has raised are fit for judicial review because "the issue is purely one of statutory interpretation, and thus is eminently fit for judicial consideration." Rocky Mountain Oil & Gas Assoc. v. Watt, 696 F.2d 734, 741 (10th Cir. 1983). But Rocky Mountain Oil & Gas, on which SUWA relies heavily, involves a purely legal question that had already had profound practical implications. Applications for permits to drill were processed according to the dictates of the particular question of statutory interpretation at issue in Rocky Mountain Oil & Gas and applications had already been denied on that basis. The Rocky Mountain Oil & Gas court was careful to point out that a company must spend many hundreds of thousands of dollars before deciding to drill a particular well and applying for a permit, and that

29

the policy at issue was causing companies to abandon certain prospects because of the "added economic uncertainty generated by [the Department of the] Interior's policy." Id. at 741–742. The point is not that economic injuries suffered by oil companies are more significant than aesthetic injuries suffered by SUWA's members, but that in the former case the harm had already materialized whereas here it has not.

It is SUWA's burden to demonstrate that the issues it has raised may properly be resolved by a federal court, and SUWA's failure to carry that burden is all but complete. SUWA has failed to establish standing. It has failed to show that the BLM's changes in policy have harmed any legally protected interest of its members, or that any harm SUWA's members may have experienced is fairly traceable to the actions of which they complain or is redressable by a decision from this Court. Moreover, SUWA has failed to demonstrate that the issues it has raised would be ripe for review even if SUWA had standing to bring its claim. The relief SUWA seeks may ultimately come through political processes, but the federal courts do not play a role in such processes, and the Court accordingly lacks jurisdiction to consider SUWA's claims.

## B. The Settlement Agreement Is Consistent With FLPMA

Having found that the Court lacks jurisdiction, there is no basis for deciding SUWA's substantive claims. However, should a higher court disagree with this Court's jurisdictional holding, the Court issues the following Opinion with respect to SUWA's claims.

SUWA moves the Court to vacate the Settlement and issue an injunction barring its implementation. SUWA makes numerous challenges to the validity of the Settlement. First, SUWA argues that the language in the Settlement runs contrary to certain provisions of FLPMA. Specifically, SUWA believes that the Settlement unlawfully precludes the BLM from exercising its authority under section 201 to undertake wilderness inventories. SUWA also argues that the

Settlement improperly limits the BLM's discretion under section 202 to manage its lands as wilderness, including designating areas as WSAs and applying to such lands IMP protection. SUWA complains that the Settlement's interpretation of section 202 is at odds with previous administrations' FLPMA policies and that such a change in position without support by legal opinion or analysis is arbitrary and capricious.

Second, SUWA argues that the Settlement violates FLPMA's land use plan amendment regulations, including 43 C.F.R. section 1610.5-5, by declaring that the BLM will not accord existing section 202 WSAs the protection they currently receive under the governing land use plans.

Third, by eliminating potential designation of section 202 WSAs from a number of ongoing NEPA analyses, SUWA argues that the Settlement conflicts with NEPA's requirement that an agency take no action that limits its choice of reasonable alternatives.

Finally, SUWA contends that by requiring the BLM to refrain from managing WSAs created pursuant to section 202 of FLPMA under the IMP, the Settlement improperly conflicts with an injunction issued by a district court in another case, Sierra Club v. Watt, 608 F. Supp. 305 (E.D. Cal. 1985).

In reviewing the legality of the Settlement, the Court adopts a de novo standard of review. Rosette, Inc. v. United States, 277 F.3d 1222, 1230 (10th Cir. 2002).

1.    **FLPMA § 201 and the Settlement**

Congress declared that the "national interest will be best realized if the public lands and their resources are periodically and systematically inventoried and their present and future use is projected through a land use planning process." 43 U.S.C. § 1701(a)(2). In order to serve this interest, Congress requires the BLM, pursuant to FLPMA section 201, to "[p]repare and maintain

31

on a continuing basis an inventory of all public lands and their resource and values." Id. §

1711(a). According to SUWA, the Settlement conflicts with section 201 because it prevents the

BLM from carrying out a full inventory of public lands, including land with wilderness

characteristics.

The Settlement provides that "the authority of [the BLM] to conduct wilderness reviews,

including the establishment of new WSAs, expired no later than October 21, 1993 . . . pursuant

to Section 603. As a result, [the BLM] [is] without authority to establish Post-603 WSAs."

Settlement Agreement at 11. SUWA argues that prohibiting future wilderness reviews precludes

the BLM from preparing and maintaining an inventory of public lands, which Congress requires

under section 201. SUWA's reasoning is that if the BLM is not allowed to inventory wilderness-

type lands, the BLM cannot accomplish its inventory directives under section 201. In other

words, because the Settlement describes "wilderness review" as involving an inventory of

wilderness-eligible lands, the end of section 603 wilderness reviews makes conducting a proper

section 201 inventory impossible.

Utah and the BLM dispute this interpretation and argue that nothing in the Settlement

impairs or limits the BLM's authority under section 201 to conduct and maintain an inventory of

public lands. They contend that the BLM's inventory authority exists separate from its expired

authority under section 603 to conduct "wilderness reviews." Utah and the BLM maintain that

the "wilderness review" referred to in the Settlement clearly relates to the wilderness review

process mandated by section 603 and does not impact the inventory process of section 201.

It is necessary to note the distinction between the BLM's authority under section 201 to

conduct a *public lands inventory* and its mandate under section 603 to perform a *wilderness

review*. While some overlap exists between the two, as both terms concern the process of

32

gathering information for the classification of federal land and both employ common steps to accomplish their respective purposes, the terms are importantly distinct. A section 201 public lands inventory is much broader and more expansive than a section 603 wilderness review. This makes sense because a public lands inventory and a wilderness review serve different purposes. The purpose of a public lands inventory is to "prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values" so that their present and future use may be projected through a land use planning process. 43 U.S.C. § 1711(a). The purpose of a wilderness review is to review the data accumulated through the BLM's public lands inventory and identify areas having wilderness characteristics in order to determine the suitability of those areas for preservation as wilderness. 43 U.S.C. § 1782(a). The distinction between the two is highlighted by the powers with which Congress equipped the BLM to carry out each objective. Congress gave the BLM authority under section 201 to take inventories of all federal lands and to assess their values, whereas section 603 does not give the BLM power to inventory land of any type; rather, section 603 instructs the BLM merely to *review* certain areas identified during the section 201 inventory and assess those areas' wilderness suitability.[4] Also, section 603 requires

---

[4]SUWA's brief highlights the distinction between sections 201 and 603:

> The plain language of the statute sets a fifteen-year deadline for the Secretary to review the lands 'identified during the inventory required by section 1711(a) of this title [*i.e.*, § 201] as having wilderness characteristics described in the Wilderness Act . . . .' Thus, § 603 simply sets a deadline for BLM's review of the results of an inventory carried out under § 201. Rather than the two distinct inventory provisions in §§ 201 and 603 that the Settlement imagines– one for wilderness, and another for all other values– there is only the single inventory provision in § 201 and a deadline in § 603 for the review of a wilderness inventory carried out under § 201.
>
> It is clear, therefore, that rather than eliminating BLM's ability to carry out wilderness reviews under § 201, § 603

the BLM to complete its review of wilderness areas identified through its section 201 inventory within fifteen years after FLPMA's enactment.  Section 201 contains no time constraints nor could such limitations be possible given Congress's mandate that the BLM maintain its inventory on a continuing basis.  Moreover, Congress directed the BLM to manage the status of areas inventoried under section 201 differently from those wilderness-eligible areas identified under section 603.  Under  201, areas identified in the process of the BLM's inventory are generally managed according to section 202's multiple-use and sustained-yield land use policy, whereas areas eligible for wilderness preservation under section 603 are required to be managed "in a manner so as not to impair the suitability of such areas for preservation of wilderness."[5]  Id. § 1782(c).

Understanding the distinction between a section 201 public lands inventory and a section 603 wilderness review is important because the Settlement seeks to preclude only one of the two; the settlement prevents the BLM from performing section 603 wilderness reviews.  In fact, the Settlement reflects that the parties clearly intended section 201 inventories to continue.  The only mention of  section 201 in the Settlement states that "nothing herein is intended to diminish BLM's authority under FLPMA to prepare and maintain on a continuing basis an inventory of all public lands and their resources and other values, as described in FLMPA [s]ection 201." Settlement Agreement at 8.

---

explicitly relies upon BLM's having just that power.  If BLM could not carry out wilderness inventories under § 201, then there would have been nothing upon which the agency could have based the wilderness review . . . required by § 603(a).

Intervenors Brief at 22 (internal citations omitted).

[5]See infra Section 2 of Discussion addressing multiple-use and sustained-yield land use policy.

Nevertheless, SUWA argues that notwithstanding the language that expressly preserves the BLM's authority under section 201, the Settlement makes the practice of inventorying all public lands impossible. SUWA reads the Settlement to prohibit *any* sort of wilderness inventory, which forecloses the BLM from properly accounting for wilderness-type areas– a critical category of public land. This interpretation of the Settlement, however, blurs the distinction between sections 201 and 603 and is plainly incorrect. The Settlement does not affect the BLM's ability to prepare and maintain an inventory of any federal land, including for a determination of wilderness characteristics. Section 201 operates independently from section 603. It is, therefore, unnecessary for the BLM to continue section 603 wilderness reviews in order to maintain an inventory of its public lands. The fact that section 603 uses as part of its wilderness review process the public lands inventory generated by section 201 is irrelevant to the continued vitality of section 201.[6] The Settlement does not preclude the BLM from taking an inventory of its wilderness-type lands for purposes other than section 603 wilderness reviews, such as evaluating land for its wilderness characteristics under section 202. Thus, section 201 remains fully intact even after the Settlement's elimination of future section 603 wilderness reviews. In fact, the proposition that the BLM may conduct section 201 inventories apart from section 603 wilderness reviews is supported by Congress's treatment of wilderness reviews in Alaska. Congress specifically exempted BLM lands in Alaska from section 603 wilderness

---

[6]Section 603 wilderness reviews are dependant upon first having an inventory of lands to review. This is why Congress provided in section 603 that the BLM "shall review those roadless areas . . . identified during the inventory required by [section 201] as having wilderness characteristics. 43 U.S.C. § 1782. As SUWA recognizes, "If BLM could not carry out wilderness inventories under section 201, then there would have been nothing upon which the agency could have based the wilderness review and recommendations to the President required by section 603(a)." Intervenors Brief at 23. The reverse, however, is not true. Nothing in section 201's broad mandate to inventory public lands is dependent upon the BLM's completion of a section 603 wilderness review.

reviews. 43 U.S.C. § 1784. But Congress also stated that the BLM, under sections 201 and 202 "may identify areas in Alaska which [it] determines are suitable as wilderness." Id. See also The Wilderness Society, 119 I.B.L.A. 168, 169-170 (1991)("While public land areas of less than 5,000 acres *could be inventoried and identified, they could not properly be designated as WSAs* because section 603(a) mandates review of roadless areas and islands of the public lands comprising 5,000 acres or more." (emphasis added)).

Conducting a section 201 public lands inventory is not dependant upon the completion of a section 603 wilderness review. As explained above, the two operate independently of each other and serve different purposes. SUWA's restrictive reading of the Settlement is not warranted and ignores the Settlement's express disclaimers preserving the BLM's section 201 inventory authority.

**2. FLPMA § 202 and the Settlement**

SUWA complains that the Settlement misinterprets section 202 of FLPMA. SUWA argues that section 202 gives the BLM the authority to establish WSAs and to treat those WSAs according to the "non-impairment" standard of the IMP. According to SUWA, the Settlement conflicts with FLPMA since it precludes the BLM from establishing or managing WSAs pursuant to section 202.

Specifically, the Settlement provides that the BLM "will not establish, manage or otherwise treat public lands, other than Section 603 WSAs and Congressionally designated wilderness, as WSAs or as wilderness pursuant to the Section 202 process absent congressional authorization." Settlement Agreement at 12.

Notably, section 202's language does not specifically grant the BLM authority to establish WSAs. In fact, the words "wilderness" and "review" do not appear in the language of

36

section 202. Rather, support for SUWA's contention that FLPMA authorized section 202 WSAs comes from a combination of the discretion Congress affords the BLM under section 202's land use management policy and from past administrations' interpretation of FLPMA.

Section 202's land use policy directs the BLM to oversee and manage the use of public lands according to the principals of multiple use and sustained yield. 43 U.S.C. § 1732(a). According to SUWA, the multiple-use and sustained-yield policy allows the BLM "near-unbounded management latitude." Intervenors Brief at 29. SUWA argues that the Settlement impinges upon this discretion by foreclosing from the BLM the option of designating wilderness-eligible lands as WSAs and managing them according to the IMP. SUWA asserts that nothing in section 202 limits the BLM's discretion to manage areas as WSAs.

In addition, SUWA argues that the Settlement's interpretation of section 202 conflicts with that of previous administrations. SUWA points out that certain IBLA decisions support previous administrations' belief that the BLM could designate and manage section 202 WSAs. See, e.g., The Wilderness Soc'y, 81 IBLA 181, 184 (1984)("Although a WSA designation is impossible under section 603(a), [section 202] provide[s] authority for BLM to manage the instant lands in a manner consistent with wilderness objectives); N.M. Natural History Inst., 78 I.B.L.A. 133, 135 (1983)("in order to qualify as a WSA under section 603(a) . . . a roadless area must contain at least 5,000 acres of public land. However, . . . the BLM is not precluded from managing [smaller areas] in a manner consistent with wilderness objectives"); The Wilderness Society, 119 I.B.L.A. 168, 169-170 (1991). SUWA also cites Sierra Club v. Watt, 608 F. Supp. 305 (E.D. Cal. 1985), in support of the BLM's authority to create section 202 WSAs. See infra Section 5 of Discussion. SUWA argues that the BLM's failure to provide an explanation or

support for its abrupt change of position on section 202 WSAs demonstrates the arbitrary and capricious nature of its decision.

Utah and the BLM dispute the validity of establishing WSAs pursuant to section 202. They argue that the only source for the BLM's authority to designate WSAs comes from section 603. And Congress specifically limited that authority in time and scope; section 603 directed the BLM to designate WSAs only during a fifteen year period of time and only of wilderness-eligible areas of 5,000 or more acres. 43 U.S.C. § 1782. Utah and the BLM point out that wilderness preservation remains the responsibility of Congress, see Norton, 524 U.S. at 58-59, and that it did not relinquish its control to the BLM through section 202 land use planning.

Utah contends that if the BLM ever had the authority to create WSAs under section 202, it was derived from and dependent upon section 603's wilderness review authority. Until 1993, the BLM consistently interpreted its section 202 WSA authority in conjunction with FLPMA section 603.[7] Utah argues that Watt and the few IBLA decisions SUWA relies upon in supporting the validity of section 202 WSAs were limited to WSAs created during the now-expired wilderness review. In fact, Utah points out that the IBLA has held pre-1993 WSA decisions to be final and that there is no authority to reconsider or revisit them to create new WSAs. See, e.g., SUWA, 163 I.B.L.A. 14, 25 (2004)("time for challenging [WSA] determination has long passed and it is well settled that BLM may administer lands not included in a WSA for other purposes, including oil and gas activities"); SUWA, 158 I.B.L.A. 212, 214 (2003)("we have stated on a number of occasions, final administrative designation of land as

_____

[7]Nearly all of the WSAs designated through section 202 were completed within the fifteen-year wilderness review process of section 603. Later efforts to use FLPMA section 202 as sole authority to include other lands as WSAs were rebuffed by IBLA on the basis that they were time-barred. See SUWA, 163 I.B.L.A. 14, 25 (2004); SUWA, 160 I.B.L.A. 225, 230 (2003).

WSAs in Utah were completed in the 1980's. . . . The lands in question were not included in a WSA. Therefore, BLM may administer them for other purposes."); Colorado Envtl. Coalition, 161 I.B.L.A. 386, 393 (2004); SUWA, 160 IBLA 225, 230 (2003). Utah argues that these decisions are consistent with the structure of FLPMA in which sections 201 and 202 establish ongoing and general inventory and planning authority, while specific wilderness review and management direction is found only in section 603 and is time-barred.

Furthermore, Utah and the BLM maintain that the Settlement does not release or change the status of existing WSAs. They argue that the Settlement is limited to the Utah-inventoried public lands that "were not identified as having the necessary wilderness character and were not classified as [WSAs] during the wilderness review conducted between 1977 and 1993 by authority of Section 603." Settlement Agreement at 1. Utah and the BLM argue that the Settlement is forward looking and does not drop IMP management from any WSA and point out that not one preexisting WSA has had its management status changed since the Settlement took effect.

Utah and the BLM also recognize that the BLM has discretion to manage its lands in a manner that is similar to the non-impairment standard of the IMP. However, this is not the same, they argue, as saying that section 202 gives the BLM the authority to establish wilderness study areas and manage them under a non-impairment standard. While section 202 gives the BLM broad authority to protect natural values on public lands– including characteristics associated with wilderness– it does not give them the authority to designate such areas as WSAs, requiring their management under the strict non-impairment standard of section 603.

The Court concludes that the Settlement is consistent with FLPMA and properly interprets the BLM's authority under section 202. Congress declared that public lands are to

39

managed "on the basis of multiple use and sustained yield unless otherwise specified by law."[8] 43 U.S.C. § 1701(a)(7). Multiple use means the management of public lands "so that they are utilized in the combination that will best meet the present and future needs of the American people." 43 U.S.C. § 1702(c). Sustained yield "means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." Id. These principles allow the BLM broad discretion in its treatment of public lands. See, e.g., Pub. Lands Council v. Babbitt, 197 F.3d 1287, 1305 (10th Cir. 1999) (multiple-use sustained-yield policy allows BLM "considerable administrative flexibility").

It must be recognized that the BLM's authority under section 603 to establish and manage WSAs is an exception to section 202's multiple-use and sustained-yield principle. Section 603 requires the BLM to manage WSAs "so as not to impair the suitability of such areas for preservation as wilderness." 43 U.S.C. § 1782(c). This standard is known as the "non-impairment standard," and all WSAs are managed accordingly; Congress did not give the BLM discretion to manage these areas otherwise. This standard is embodied in the BLM's interim management policy that governs the BLM's treatment of WSAs.

The plain language of FLPMA provides for the establishment and management of WSAs exclusively under section 603, which by its own terms expired fifteen years after FLPMA was enacted. SUWA's argument that section 202 gives the BLM authority to establish WSAs ignores the fact that the establishment of WSAs under section 603 is an exception to, rather than a part

---

[8]Section 202 states that "[t]he Secretary shall . . . develop maintain, and when appropriate, revise land use plans. . . In the development and revision of land use plans, the Secretary shall . . . use and observe the principles of multiple use and sustained yield . . . ." 43 U.S.C. § 1712(a)-(c).

of, section 202's multiple-use and sustained-yield principle. See Norton, 542, U.S. at 58 ("Of course not all uses are compatible [to multiple use and sustained yield]. Congress made the judgment that some lands should be *set aside* as wilderness at the expense of commercial and recreational uses"(emphasis added)). SUWA is correct in arguing that the BLM's discretion under section 202 is sufficiently broad to manage areas similar to the non-impairment standard of the IMP. However, simply because WSA-level protection is compatible with the multiple-use and sustained-yield policy of section 202 does not mean that Congress authorized the creation of WSAs or the cross application of section 603's non-impairment management standard. In fact, such an interpretation of FLPMA makes section 603 redundant and emasculates the section. Had section 202 authorized the designation and management of WSAs there would be no need for Congress to have included section 603. There is no evidence that Congress intended, either tacitly or explicitly, to allow section 603's WSA authority to continue under section 202.

SUWA's concern that the Settlement eliminates the BLM's discretion for all time to afford WSA-type protections to areas not included by section 603's wilderness review is unfounded. The Settlement allows for the BLM to exercise the full extent of its discretion under section 202's multiple-use and sustained-yield policy. As discussed above, this policy provides the BLM with expansive authority to protect and to preserve the natural values of lands. Both Utah and the BLM acknowledge that the BLM has the discretion to manage lands in a manner that is similar to the non-impairment standard by emphasizing the protection of wilderness characteristics as a priority over other potential uses.[9] The Settlement specifically provides that

---

[9]Section 202 orders the BLM to "give priority to the designation and protection of areas of critical environmental concern." 43 U.S.C. § 1712(c)(3). Using this mandate, section 202 still provides the BLM with the authority to protect and prevent irreparable damage to areas with wilderness characteristics.

"nothing herein shall be construed to diminish the Secretary's authority under FLPMA to . . . giv[e] priority to the designation and protection of areas of critical environmental concern, or . . . take any action necessary, by regulation or otherwise, to prevent unnecessary or undue degradation of public lands."  Settlement Agreement at 11.  Although FLPMA limits the BLM's authority to designate and manage lands as WSAs, it provides expansive authority to protect and to preserve public lands in other ways.  Thus, the proper level of wilderness preservation can be attained without having to bleed together section 603's wilderness review authority with section 202's multiple-use and sustained-yield land use provisions.  The only real difference between managing land under section 202 to protect its wilderness character and managing land as a WSA to do the same thing– and this distinction is at the crux of this lawsuit– is that a WSA, once established, cannot be revised; it becomes, in effect, *de facto* wilderness until Congress acts, whereas under section 202, the land will be subject to possible changes in management plans.

The Settlement represents a change in the BLM's prior interpretations of FLPMA.  Both Utah and the BLM acknowledge as much.  However, a change in the BLM's position regarding WSAs does not mean its interpretation is incorrect.  The BLM has the authority, if not the responsibility, to correct agency policy "that [is] grounded upon a mistaken legal interpretation."  Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 417 (1993).  Because the interpretation set forth in the Settlement is consistent with FLPMA, SUWA's claim that the Settlement is arbitrary and capricious is unfounded.

Whether the Settlement affects section 202 WSAs designated after 1993 or after the Settlement's implementation is not fundamentally important.[10]  The only material issue is

_____

[10]Although not necessary to the Court's ruling on this issue, it appears that the Settlement, when read in its entirety, only affects post-settlement WSAs within Utah.  This conclusion is supported by the fact that the BLM has not changed the management status of a

whether the BLM acted consistently with the law when it entered into the Settlement and clarified its overall direction against the use of section 202 to create WSAs. The Court concludes that the Settlement is consistent with the law and restores the proper interpretation of FLPMA.

**3.      The Settlement and FLPMA's Land Use Plan**

Congress directs the BLM to oversee and manage the use of public lands according to a land use plan. Unless otherwise directed by law, this plan is governed by the principles of multiple use and sustained yield. 43 U.S.C. § 1732(a). The BLM may deviate from, revise or amend the land use plan under certain circumstances. If, however, the BLM changes an area's land use plan, it must follow a plan amendment or revision process.

SUWA contends that the Settlement conflicts with existing land use plans because it affects the management status of section 202 WSAs, which have been managed according to the IMP. According to SUWA, the BLM's change in policy with respect to section 202 WSAs constitutes an amendment to the land use plan which requires that a NEPA analysis be prepared to consider the potential environmental impacts of the proposed change. Because the BLM has failed to perform a NEPA analysis, SUWA argues that the Settlement conflicts with the land use plan amendment process. SUWA argues that if the BLM wishes to amend its land use plan it must do so according to the agency's regulations and may not circumvent the amendment process by entering into a non-public agreement.

Utah and the BLM respond simply by pointing out that the Settlement does not affect the management of any existing WSAs and insist that the BLM will manage public lands consistent with existing land use plans. Utah points out that the BLM has implemented the Settlement

---

single pre-settlement WSA.

without changing management or status of any designated WSA, including those established under section 202.

The Court concludes that the Settlement does not run afoul of the land use amendment process. As discussed above, nothing in section 202 suggests that the BLM has authority outside of section 603 to designate lands as WSAs. While the Settlement represents a change from the BLM's prior interpretation, agencies have inherent authority to change their positions to conform to applicable law. Shalala, 508 U.S. at 417. And NEPA does not obligate an agency to examine actions that are beyond the agency's authority. Dept. of Transp. v. Public Citizen, 541 U.S. 752 (2004). Furthermore, SUWA does not provide any evidence to support the claim that the BLM has changed the management status of any preexisting WSA. This fact supports the conclusion that the Settlement does not conflict with existing WSA land use plans.

**4.      NEPA and the Settlement**

SUWA argues that the Settlement conflicts with NEPA for two reasons and must, therefore, be vacated. First, SUWA claims that by excluding any consideration of possible section 202 WSA designations in the BLM's NEPA analysis for land use plan amendments in Vernal, Price, and Richfield, Utah, the Settlement violates NEPA's requirement that the agency not "limit the choice of reasonable alternatives" when a NEPA process is underway. 40 C.F.R. § 1506.1(a)(2). Second, SUWA contends that by prohibiting the BLM from ever establishing additional section 202 WSAs, the Settlement will necessarily "limit the choice of reasonable alternatives" in the future, whenever the BLM is considering management proposals for additional wilderness-eligible lands. Id.

The Court, however, concludes that the Settlement does not implicate NEPA's requirement that the BLM refrain from limiting the choice of reasonable alternatives in either its

ongoing or future land use planning.[11]  The Settlement would only violate 40 C.F.R. section

1506.1 to the extent that it commits the BLM to taking action that would limit its choice of

*reasonable* alternatives.  Clearly an illegal or unauthorized alternative cannot be considered

reasonable and need not be contemplated by the agency as a possible land-use alternative.  In this

case, the BLM has merely agreed with Utah that it will no longer consider as a land-use planning

alternative a means of protecting public land that is not authorized by law .  As the Court

explained above, the BLM's authority to create new WSAs expired no later than October 21,

1993.  Because the BLM no longer has authority to create new WSAs or to manage additional

lands under section 603's non-impairment standard, the BLM need not consider the creation of

new WSAs as part of its NEPA analysis.  Such an alternative would not only be unreasonable, it

would be contrary to FLPMA.  The Settlement, therefore, does not conflict with the procedural

requirements of NEPA.  Rather, the Settlement embodies the BLM's proper and legal

interpretation of FLPMA.

5.      **The Settlement Agreement and Sierra Club v. Watt**

        SUWA contends that the Settlement directly violates an injunction issued by a California

district court in Sierra Club v. Watt, 608 F. Supp. 305 (E.D. Cal. 1985).  In Watt, the court

addressed whether FLPMA's wilderness review provisions applied to lands of less than 5,000

acres.  The original WIH issued after the enactment of FLMPA allowed lands of less than 5,000

---

        [11]Utah argues that even if the designation of new WSAs is a separate and reasonable
alternative that the BLM should consider, the regulation requiring this consideration does not
apply to the Settlement.  Utah asserts that this regulation only applies to specific actions taken
pursuant to a proposed project undergoing NEPA review, as opposed to the Settlement, which
directs that the WIAs be managed under the existing RMPs and EIS.  Further, the Settlement
represents a separate and distinct action from the ongoing land use plan revisions.  See
Wilderness Watch Oregon Natural Resources Council, 142 IBLA 302, 305 (1998).  Although
SUWA disagrees that the Settlement is a separate and distinct BLM action, the Court need not
address this issue because the creation of new WSAs is not a reasonable alterative.

acres that were either contiguous with other federal lands that might be preserved as wilderness or were of a size suitable for wilderness management to be included in the wilderness review process. See id. at 310. And in 1980, Secretary of the Interior Andrus issued an order formally creating 158 of these smaller WSAs, under the authority of section 603 of FLPMA.

But in 1982, Secretary of the Interior Watt issued an order concluding that lands of less than 5,000 acres (Watt Drop Areas) were not properly considered for wilderness status and, therefore, could not be managed as WSAs. See id. at 312. On the basis of this conclusion, Secretary Watt removed the WSA status from these areas. See id. at 338. And as a result these lands could be considered for less strict forms of management than wilderness. See id. Fourteen WSAs in Utah, totaling 25,187 acres, were affected by Secretary Watt's order.

The plaintiff environmental groups brought suit to set aside Secretary Watt's order. See id. at 313. Although the court upheld Secretary Watt's conclusion that section 603 of FLPMA did not authorize wilderness reviews for lands of less than 5,000 acres and his decision to withdraw section 603 WSA status from these areas, the court nonetheless determined that the management of the Watt Drop Areas could not be changed absent an exercise of the Secretary's discretion. See id. at 330-42. Withdrawal of the areas' section 603 WSA status did not necessarily leave the areas open to development under multiple-use management. Because Secretary Watt had not exercised his discretion in removing WSA status from these lands, the court ordered the agency not to change the management of the Watt Drop Areas "unless and until the Secretary exercises his discretion in a manner permitted by law to change that status." Id. at 344. According to the court, the Watt Drop Areas then returned to "the status of lands potentially available for inclusion as WSAs and subject to management as such under the IMP."

See id. at 340.  The areas, therefore, continue to be protected by the the non-impairment standard of the IMP.  Id.  The Government did not appeal the Watt court's decision.

SUWA argues that the Settlement directly conflicts with the court's injunction in Watt, requiring the BLM to manage the Watt Drop Areas under the non-impairment standard of the IMP.  SUWA claims that the Settlement is contrary to the Watt injunction because stipulation 6 of the Settlement orders the BLM to "refrain from applying the IMP . . . to BLM lands other than [s]ection 603 WSAs."  Because the Watt Drop Areas are not WSAs created under the authority of section 603, the Settlement requires that they no longer be protected under the IMP.  Therefore, the provisions of the Settlement are outside the BLM's power and are illegal.

The BLM, in contrast, argues that although the Settlement precludes the establishment of additional WSAs in Utah, it does not disestablish any existing WSAs or otherwise change the existing management of any public lands.  Instead, the stipulations in the Settlement are "forward looking."  Next, the BLM notes that the injunction in Watt does not freeze the BLM's management of lands less than 5,000 acres.  Rather, the injunction merely requires the Secretary to exercise his lawful discretion in order to change the management of such lands.  If the Secretary decides in the future to disestablish any existing WSAs established under section 202 and to remove such areas from the non-impairment standard—a decision the BLM argues that the Settlement allows but does not require—the Secretary will make such changes as an exercise of his lawful discretion through the land-use planning process.  Therefore, the BLM is in full conformity with the decision in Watt.

SUWA, however, argues that the BLM's position that the Settlement does not affect any existing section 202 WSAs "simply cannot be squared" with the language of the Settlement.  Specifically, SUWA cites to the language of stipulation 6, mentioned above, and stipulation 5,

which provides that the BLM "will not establish, manage, or otherwise treat public lands, other than section 603 WSAs . . . as WSAs . . . pursuant to the [s]ection 202 process." According to the plain terms of the agreement, therefore, lands encompassing existing section 202 WSAs may not be treated as WSAs.

Utah asserts that the Settlement does not conflict with the Watt injunction because the Settlement does not address the management of WSAs created before 1993. Utah claims that the section 202 WSAs created in Utah prior to 1993 continue to be managed under the IMP. And the Settlement preserves the existing protections found in the BLM RMPs. Utah does not challenge IMP management of section 202 WSAs established before 1993 because it argues that section 202 became invalid as authority to create WSAs *after* FLPMA's section 603 mandate expired in 1993. According to Utah, a reasonable construction of the Settlement in its entirety preserves IMP management of these areas because the Settlement does not change either the status or the management of the section 202 WSAs created before 1993.

Utah disputes SUWA's interpretation of stipulations 5 and 6 in the Settlement. Although stipulation 6 orders the BLM to "refrain from applying the IMP . . . to BLM lands other than [s]ection 603 WSAs," Utah claims that the words "[s]ection 603 WSAs" constitute a defined term in the Settlement that includes all WSAs created before 1993, both of the section 603 and section 202 variety. The Settlement's introduction explains that the Settlement addresses the Utah re-inventoried areas that "were not classified as . . . WSAs during the wilderness review conducted between 1976 and 1993 by authority of [s]ection 603 of [FLPMA] ("Section 603 WSAs")." Therefore, the term "[s]ection 603 WSAs" includes the section 202 WSAs that were identified as having wilderness character during the wilderness review between 1976 and 1993. Utah also notes that the Settlement uses the term "Post 603 lands" throughout to refer to public

lands identified for wilderness study, classification, or management after 1993. And the Settlement itself recognizes that the "parties agree it is in the public interest to . . . enter into a stipulation with respect to all Post-603 Lands."

Utah finally points out that all the parties agree that since the BLM and Utah agreed to the Settlement the BLM has not dropped IMP management of any officially designated WSAs, including section 202 WSAs. Utah asserts that there is not a single instance of a section 202 WSA being released in the three years since the Settlement was signed. At oral argument, SUWA even conceded that there are no post-1993 WSAs that are no longer managed as WSAs.

The Court is persuaded that upon a careful reading of the Settlement, it is apparent that the BLM and Utah did not intend to apply the provisions of the Settlement to WSAs created before 1993, including those created under the authority of section 202. The provisions in the Settlement relating to WSAs refer to those WSAs created after 1993 and after the expiration of the BLM's wilderness authority under section 603. The decision in Watt, issued in 1985, clearly did not address WSAs created after the wilderness review provisions of section 603 expired in 1993. So the WSAs challenged by Utah are not the same WSAs that were the subject of the Watt injunction. Therefore, the Settlement does not run afoul of the injunction in Watt.

### IV. SUMMARY and CONCLUSION

From its inception, this case has been about wilderness. Ironically, the case's beginning, in 1996, and its ending, in 2006, are 180 degrees apart. The original plaintiffs complained of actions by the Clinton Administration that they believed were designed to improperly increase the number of wilderness study areas in the United States. They argued that the BLM's use of FLPMA to create wilderness study areas was illegal. This, they contended, had the effect of creating *de facto* wilderness which prevented even the possibility of managing the lands

designated as WSAs pursuant to the multiple use and sustained yield formula applicable under FLPMA.

The landscape of the dispute changed dramatically with a new presidential administration in 2001. The new executive branch policymakers generally disagreed with the approach of their predecessors and agreed with plaintiffs, both in terms of policy and legal interpretation of FLPMA. Not surprisingly, a settlement between the Plaintiffs and the Defendants was reached. In the meantime, however, the intervenors had intervened. The intervenors were unquestionably keenly interested in the legal issues of the case, many of them having been involved in successfully encouraging the Clinton Administration to adopt the very policies and legal construction that prompted this lawsuit in the first place. The intervenors, not surprisingly, did not agree with the settlement and now seek to have it set aside.

In finding that the original plaintiffs did not have standing to challenge the Clinton Administration's actions in all but one of their causes of action, the Tenth Circuit emphasized that no matter how much the plaintiffs disagreed with the decision to undertake a new wilderness inventory and no matter how much the plaintiffs were concerned that such action carried the prospect of in an illegal designation of wilderness, the fact of the matter was that the p laintiffs had no legally recognized right to participate in the section 201 inventory. Therefore, they had no legally cognizable interest upon which a case or controversy could rest. Though their concerns might later ripen into an actual controversy, that day had not yet arrived.

The present status of the case presents similar problems with respect to standing and ripeness. No matter how much SUWA disagrees with the present administration's policy decisions and its legal interpretation of FLPMA, it has failed to point to an existing legally cognizable right or interest that is being sufficiently affected to constitute a justiciable case or

controversy.  They argue with great vigor that section 202 should be interpreted to allow for the

creation of WSAs.  But they fail to show that even if the Settlement Agreement were eliminated

there exists even the remotest possibility that a section 202 WSA would ever be considered by

the current defendants, let alone created.  It is undisputed that the current administration

acknowledges and agrees that under sections 201 and 202 any lands found to have wilderness

characteristics could in the exercise of the BLM's discretion be managed so as to be given

protection essentially identical to that afforded a WSA.  And it is also undisputed that no such

land use plans have been proposed by the present administration.  The intervenors cannot

possibly believe that the adoption of their interpretation of FLPMA (which would allow the DOI

to create WSAs pursuant to section 202) would either eliminate any present harm they are

suffering or, just as importantly, afford them any concrete relief.  A justiciable case is a case in

which a court decision will make a difference; this dispute about wilderness policy would be

utterly unaffected by the decision for which the intervenors ask.

      SUWA's attempts to demonstrate standing serve only to underscore the lack of it.  The

Court has searched in vain to find a single instance of any of the following either as a result of

the Settlement Agreement or otherwise:

* the disestablishment of any existing section 202 WSA

* the change in management of any existing section 202 WSA

* a decision by the BLM to allow activities, such as oil and gas exploration, upon
  public lands which would not have been made by the current administration if the
  Settlement had not been reached and/or if SUWA's interpretation of section 202
  was declared by this Court to be the proper interpretation of FLPMA

* a BLM decision that would have been different or would now be changed if the
  Settlement Agreement were dissolved

51

\*    any BLM decision pursuant to section 201, or section 202, that would be altered in any manner with respect to a recognition of wilderness characteristics if the Settlement Agreement were dissolved

Without evidence of the existence of such possibilities, or some other form of actual or imminent harm, the present iteration of this case presents neither case nor controversy under Article III of the Constitution.  There is no standing, no ripeness, and no final agency action.

Furthermore, as explained in the body of this Opinion and Order, even if this case were justiciable, the plaintiffs and the present embodiment of the defendants clearly have the better interpretation of the law.  It makes no sense that the same Congress that jealously recognized its sole authority to declare wilderness and that set up two major laws (the Wilderness Act and FLPMA) to accomplish a properly considered exercise of that authority, would have created within one general section (section 202) of FLPMA an open-ended authority on the part of the executive branch of government to create WSAs which, once created, result in *de facto* wilderness.  The Wilderness Act's process clearly ended in ten years, and FLPMA's wilderness designation provisions, including those relating to the creation of WSAs, clearly ended in 1991, with the President's recommendation to Congress based thereon to occur no later than 1993. Accordingly, even if SUWA had standing, the Court would find its cross claims to be without legal support.

IT IS SO ORDERED.

DATED this 20th day of September, 2006.

_____
Dee Benson
United States District Judge